```
 1  JOSEPH T. MCNALLY
    Acting United States Attorney
 2  LINDSEY GREER DOTSON
    Assistant United States Attorney
 3  Chief, Criminal Division
    JEFF MITCHELL (Cal. Bar No. 236225)
 4  Assistant United States Attorney
    Major Frauds Section
 5       1100 United States Courthouse
         312 North Spring Street
 6       Los Angeles, California 90012
         Telephone: (213) 894-0698
 7       Facsimile: (213) 894-3713
         E-mail:    jeff.mitchell@usdoj.gov
 8
    Attorneys for Plaintiff
 9  UNITED STATES OF AMERICA
```

                    UNITED STATES DISTRICT COURT

                FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 24-00054-JWH |
|---|---|
| Plaintiff, | GOVERNMENT'S POSITION RE: SENTENCING FOR DEFENDANT IPPEI MIZUHARA; EXHIBIT; DECLARATION OF AUSA JEFF MITCHELL |
| v. | |
| IPPEI MIZUHARA, | SENTENCING DATE: 02/06/2025 |
| Defendant. | |

   Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Jeff Mitchell, hereby files its position related to the sentencing of defendant IPPEI MIZUHARA.

//

//

//

The government's sentencing position is based upon the attached memorandum of points and authorities, the attached exhibit and declaration, the files and records in this case, the Presentence Report, and such further evidence and argument as the Court may permit.

Dated: January 23, 2025          Respectfully submitted,

JOSEPH T. MCNALLY
Acting United States Attorney

LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division


         /s/ Jeff Mitchell
JEFF MITCHELL
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Former interpreter Ippei Mizuhara ("defendant") engaged in a long running fraud scheme against baseball player Shohei Ohtani - the person he was hired to assist. His years-long theft of funds from Mr. Ohtani and the myriad lies he told to Mr. Ohtani's agents and financial advisors to cover up his theft represent a calculated betrayal of the very person he was hired to help.

On June 4, 2024, defendant pleaded guilty to both counts of the Information in which he has been charged in this case, i.e., Bank Fraud and Subscribing to a False Tax Return. (PSR ¶¶ 1-3.) There are no remaining counts to be dismissed.

In defendant's plea agreement, he admitted to all facts known to the government. There are no additional uncharged facts or conduct. Specifically, defendant admitted to the following facts:

> Victim A was a professional baseball player from Japan who signed a contract to play baseball for a Major League Baseball team (the "Team") located in the Central District of California beginning in 2018. At approximately that same time, defendant was hired by the Team to be a Japanese-language interpreter for Victim A. Defendant also drove Victim A to meetings and interpreted for Victim A outside of baseball activities. Defendant acted as a de facto manager and gatekeeper to Victim A. In that role, defendant would regularly interact with Victim A's sports agents and financial advisors on behalf of Victim A because Victim A did not speak English and Victim A's agents and financial advisors did not speak Japanese. Victim A paid defendant separately for the additional work.
>
> On March 8, 2018, defendant accompanied Victim A to a bank in Phoenix, Arizona ("Bank A"), to assist Victim A in opening a bank account to deposit his payroll salary. Bank A was a domestic financial institution insured by the Federal Deposit Insurance Corporation. Inside Bank A, defendant interpreted for Victim A and assisted him in opening a bank account (the "x5848 Account"). Defendant also interpreted for Victim A when the bank employee provided Victim A the login information for the x5848 Account on Bank A's website.

Beginning in or about September 2021, defendant began placing sports bets with an illegal bookmaker. Shortly thereafter, defendant began to lose bets and quickly became indebted to the bookmaker. Unable to pay his gambling debts, defendant orchestrated a scheme to deceive and cheat Bank A in order to obtain money from the x5848 Account.

Beginning no later than November 2021 and continuing through March 2024, defendant engaged in a scheme or plan designed to fraudulently obtain money from the x5848 Account. Defendant recalled the password for the x5848 Account from when he assisted Victim A with opening the account in 2018, and defendant was able to successfully sign into the x5848 Account on Bank A's website. After obtaining access to the x5848 Account, defendant changed the security protocols on the account without the permission or authorization of Victim A. Specifically, defendant changed the registered email address and phone number on the account so Bank A employees would call defendant, and not Victim A, when attempting to verify wire transfers from the x5848 Account.

In furtherance of the scheme, defendant impersonated Victim A and used Victim A's personal identifying information to trick and deceive Bank A employees into authorizing wire transfers from x5848 Account. For example, on or about February 2, 2022, Bank A denied an attempted wire transfer. Defendant then called Bank A to complete the wire transfer. During the call, defendant falsely identified himself as Victim A and falsely stated that he was attempting to wire funds to an associate of the bookmaker for a car loan. The bank employee attempted to verify the caller by sending a six-digit code via text message to the registered phone number on the x5848 Account. Because defendant had already changed the registered phone number on the account, the bank's text message was sent to defendant. Defendant then read the six-digit code back to the Bank A employee and completed the wire transfer. In total, defendant called Bank A and impersonated Victim A on approximately 24 occasions.

Between November 2021 and March 2024, defendant regularly logged into the x5848 Account through Bank A's website and initiated wire transfers from the x5848 account to the bookmaker and his associates as payments for gambling debts. For example, on June 20, 2023, defendant accessed the x5848 Account from the Central District of California pretending to be Victim A and wire transferred $500,000 to an associate of the bookmaker. At a minimum, defendant caused Bank A to transfer the following funds to bank accounts of associates of the bookmaker:

| Date | Amounts | Account |
|---|---|---|
| 11/15/2021 | 1 wire for $40,010 | Xoom.com |
| 2/4/2022 | 1 wire for $300,000 | X4010 |
| 2/28/2022 to 10/13/2023 | 36 wires totaling $15,000,000 | X1911 |
| 12/15/2023 to 1/8/2024 | 3 wires totaling $1,250,000 | X1530 |

Defendant did not notify, or seek permission from, Victim A before transferring money from the x5848 Account.

In addition, in September 2023, defendant needed $60,000 worth of dental work. Victim A agreed to pay for defendant's dental work and authorized a check to defendant for $60,000 drawn on a business account at Bank B; however, without permission or authorization, defendant provided his dentist with Victim A's debit card number for the x5848 Account and charged $60,000 to the x5848 Account. After defendant paid his dentist with Victim A's debit card, defendant then deposited the $60,000 check from Victim A into defendant's personal checking account for defendant's personal use.

Between January and March 2024, defendant also purchased approximately $325,000 worth of baseball cards at online resellers eBay and Whatnot, with payments drawn on the x5848 Account, including baseball cards featuring Yogi Berra, Juan Soto, and Victim A. Defendant purchased the above-described collectible baseball cards from eBay and Whatnot with the intent to resell them at a later date and use the proceeds for his own personal benefit.

When Victim A's sports agent and financial advisors asked defendant for access to the x5848 Account, defendant falsely told them that Victim A did not want them to access [] the account because it was private. In truth and in fact as defendant then knew, defendant did not want Victim A's sports agent and financial advisors to review the x5848 Account because he feared they would notice that defendant stole millions of dollars from Victim A. Based on defendant's false statements of material fact, defendant fraudulently obtained more than $16,975,010 from the x5848 Account.

Defendant also admits that defendant knowingly and willfully falsely reported his total taxable income to the Internal Revenue Service ("IRS") on his tax return for tax year 2022. Specifically, on or about February 1, 2024, in Los Angeles County, defendant willfully made and subscribed

3

>to a materially false United States Individual Income Tax Return, Form 1040, for tax year 2022, which was filed with the IRS and verified by a written declaration that it was made under the penalties of perjury, which return defendant did not believe to be true and correct as to every material matter, in that defendant reported on line 15 that his total taxable income for calendar year 2022 was $136,865, when, in truth and in fact, as defendant then knew, his total taxable income for the year 2022 was substantially higher than he reported. For instance, defendant filed as "single," and claimed a $10,000 deduction in Schedule A, line 5e, when, in truth and in fact, as defendant then knew, he was married and only entitled to a $5,000 deduction. Defendant also admits that he failed to report additional income of $4,100,000 for the year 2022. Defendant admits that the source of the unreported income was from the bank fraud scheme on the x5848 Account described above.
>
>The false information provided by defendant was material in that it affected the IRS's calculation of the amount of income that defendant had received in 2022, and prevented the IRS from verifying the accuracy of the amount of tax claimed to be owed on the return and determining whether additional income tax was owed. As a result of the false information defendant provided, defendant owes additional taxes of approximately $1,149,400 for tax year 2022 (before interest and penalties).

(Plea Agreement ¶ 16.)[1]

## II.   THE PRESENTENCE REPORT

The United States Probation Office ("USPO") prepared a Presentence Report ("PSR"), which was disclosed to the parties on September 18, 2024.  The PSR calculated the total offense level applicable to defendant to be 25.  (PSR ¶ 72.)  The PSR also calculated a criminal history category of I.  (PSR ¶ 77.)  The PSR calculated the guideline sentence to be 57 to 71 months' imprisonment, between two and five years of supervised release for Count One, one year of supervised release for Count Two, a fine range

---

[1] The victim has publicly identified himself as Shohei Ohtani.

4

of $20,000 to $1,000,000, and a mandatory special assessment of $200. (PSR ¶¶ 120, 125, 126, 134, 135.)

## III. PROBATION OFFICE'S RECOMMENDATION

The USPO has recommended a variance below the Guideline range. Specifically, the USPO recommended the following sentence: a 48-month term of imprisonment, a three-year term of supervised release, restitution of $16,975,010 to Shohei Ohtani and $1,149,400 to the IRS, and a special assessment of $200. (USPO Recommendation Letter at 1-2.) The Probation Officer found that defendant does not have the ability to pay a fine. (Id. at 2.)

## IV. NO OBJECTIONS TO THE PRESENTENCE REPORT

The United States does not object to the findings set forth in the PSR.

## V. THE GOVERNMENT'S RECOMMENDATION

The United States objects to the Probation Officer's recommended sentence below the Guideline range.

Accordingly, and as set forth herein, the United States submits that defendant should be sentenced for an overall offense level of 25 and a criminal history category I, that is, a term of 57 months' imprisonment, followed by a three-year term of supervised release, and a mandatory special assessment of $200. The recommended sentence addresses the considerations set forth at 18 U.S.C. § 3553(a), as discussed herein.

### A. The Nature and Circumstances of The Offense and the History and Characteristics of the Defendant

Section 3553(a)(1) provides that the Court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant.

5

In 2018, defendant worked as Mr. Ohtani's interpreter and was employed by a Southern California baseball team. (PSR ¶ 97.) At that time, defendant began participating in frequent private poker games with team players held in hotel rooms. (Id.) According to defendant, it was at this time that he was first introduced to Mathew Bowyer, the bookmaker who ran the illegal sportsbook. (Id.)

Defendant was initially paid a salary of $85,000 by the team, but it increased significantly in 2022 to $250,000. (PSR ¶ 99.) Defendant's salary increased again in 2024 to $500,000 when he was employed by a new baseball team. (PSR ¶ 106.) In addition to his employment with the MLB teams, Mr. Ohtani provided defendant an additional salary and provided him a Porsche Cayenne to drive. (PSR ¶ 108; Complaint Affidavit ¶ 32, Dkt. No. 1.) Despite these considerably generous salaries, they were unable to keep pace with defendant's gambling debt to Bowyer. Between December 2021 and January 2024, defendant placed approximately 19,000 bets online through Bowyer's illegal sportsbook and quickly incurred a debt of $40,678,436.94. (PSR ¶ 73.) Defendant stole more than $16 million dollars from Mr. Ohtani to repay a portion of the debt.

Based on defendant's previous court filings, the government expects defendant to argue that the offense conduct was caused by an addiction to gambling. Even if defendant is addicted to gambling, it cannot fully explain defendant's conduct because defendant used the stolen funds for numerous personal expenses that had nothing to do with gambling. For example, defendant used Mr. Ohtani's debit card to charge approximately $325,000 to eBay for baseball cards. (PSR ¶ 27.) In addition, when defendant needed dental work, he asked Mr. Ohtani for financial help. Mr. Ohtani agreed to pay for the dental

6

work and issued a check for $60,000.  Instead of using the check to pay for the dental work, defendant deposited the check into his personal bank account and then used Mr. Ohtani's debit card to pay for the dental work, without Mr. Ohtani's authorization or knowledge. Defendant did not use the additional funds from the check, or sell the baseball cards, to repay the gambling debt to Bowyer.  Instead, they were deposited into his personal account and used for personal expenditures.  Further, and most compelling, when defendant actually won money from Bowyer, he didn't repay Mr. Ohtani or credit the account from which he had stolen the funds.  (Complaint Affidavit ¶ 16.)  Instead, he instructed Bowyer to wire the money to defendant's personal bank account.  (Id.)  This conduct undermines any argument that his offense was caused by an addiction and highlights another potential cause – greed.

Further, this was not an isolated incident.  Indeed, the full scope of the scheme was years in the making.  Defendant unlawfully gained access to Mr. Ohtani's bank account in September 2021, changed the registered phone number to defendant's cell phone, and then began impersonating Mr. Ohtani when the bank called to authorize the wire transfers to Bowyer's associates.  (Exhibit; PSR ¶¶ 21-22.)  His criminal conduct continued for more than two years.

Even if defendant was able to repay the victim, which he cannot, defendant's conduct has harmed Mr. Ohtani in more ways than simply economic harm.  Indeed, defendant's conduct has harmed Mr. Ohtani's greatest asset – his reputation and goodwill.  Even though the Complaint Affidavit attempted to clear the record by describing the overwhelming evidence that showed that Mr. Ohtani had no knowledge of defendant's criminal activities, several public figures continued to

7

question how Mr. Ohtani did not notice that this one particular account was being mismanaged.[2] Further, to this day, major e-commerce websites sell merchandise that have turned Mr. Ohtani into a meme and suggest that he was involved in the criminal activity.

To be clear, Mr. Ohtani is a victim. Mr. Ohtani did not speak English and none of his agents, accountants, or financial advisors spoke Japanese. (Complaint Affidavit ¶ 24(j).) Mr. Ohtani relied on defendant to communicate with the outside world, including his financial advisors. Indeed, it was this language barrier that made defendant the gatekeeper to Mr. Ohtani. When his agents and financial advisors repeatedly asked defendant for access to the x5848 Account, defendant abused his position as gatekeeper and falsely told them that Mr. Ohtani did not want them to access the account. (PSR ¶ 29.) In truth, defendant lied to the agents and financial advisors, and prevented them from protecting Mr. Ohtani, because defendant feared they would discover that he stole millions of dollars.

In mitigation, the government recognizes that defendant is no longer an interpreter or in a position to take advantage of those close to him, which was the environment in which the crime occurred. In addition, the negative publicity surrounding defendant's felony conviction serves as a deterrent for both defendant and others from engaging in similar conduct. Finally, the government recognizes that

---

[2] Available at:

https://www.themirror.com/sport/baseball/pete-rose-dodgers-ohtani-remark-448220

https://www.natesilver.net/p/i-still-have-2-big-questions-about

8

defendant may lose his status as a legal permanent resident and be deported after his term of imprisonment. (PSR ¶ 116.)

Ultimately, the government submits, the motivating factor behind defendant's crimes was not a gambling addiction but rather greed. Defendant betrayed Mr. Ohtani's trust, causing him financial, reputational, and emotional harm.  Let there be no doubt, Mr. Ohtani is truly a victim and has suffered, and will continue to suffer, harm from defendant's conduct.[3]  This kind of betrayal and greed calls for a significant term of imprisonment within the sentencing Guidelines range.

**B.    THE NEED FOR THE SENTENCE IMPOSED**

Section 3553(a)(2) provides that in determining the particular sentence, the Court shall consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct.

Defendant accepted responsibility earlier than most defendants. Defendant waived his right to a grand jury and indictment, and pleaded guilty to an information early in the prosecution, thereby saving the government significant resources.  Defendant also waived his right to a full and complete set of discovery.  In addition, on March 21, 2024, HSI agents intercepted defendant at the Los Angeles International Airport, after he deboarded from an international flight from South Korea, and seized defendant's cell phone in preparation for a search warrant; however, defendant voluntarily

---

[3] Mr. Ohtani submitted a victim impact statement for the Court's consideration.  Pursuant to the Victim's Rights Act, the Victim Impact Statement shall be submitted for filing under seal.

9

signed a consent form consenting to the search of his cell phone. These factors are not accounted for in the Guidelines; however, the Court can, and should, consider these factors under 3553(a).  Indeed, consideration of these facts under 3553(a) will encourage defendants in the future to accept responsibility early and save additional government and judicial resources.  Defendant's early acceptance of responsibility here is evidence of his respect for the law, which should be considered under 3553(a)(2).

### C. NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES

Section 3553(a)(6) provides that in determining the particular sentence, the Court shall consider the need to avoid unwarranted sentence disparities.  Following the recommended sentencing guideline range will avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

## VI. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 57 months' imprisonment, three years of supervised release, restitution of $16,975,010 to Shohei Ohtani and $1,149,400 to the IRS, and a special assessment of $200.

DECLARATION OF JEFF MITCHELL

I, Jeff Mitchell, declare as follows:

1. I am an Assistant United States Attorney in the United States Attorney's Office for the Central District of California. I represent the government in this case.

2. Attached hereto as an exhibit to the Government's Sentencing Position for Defendant Ippei Mizuhara is an audio file of a phone call obtained from Bank A, as described in the Complaint Affidavit. (Dkt. No. 1.)

3. I instructed IRS Special Agent Chris Seymour to edit the audio file to redact the name of Bank A and the name of the unindicted co-conspirator mentioned in the call.

4. Other than those modifications, the audio file is a true and accurate representation of the evidence obtained from Bank A.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on January 23, 2025.

_____
JEFF MITCHELL

EXHIBIT

CD with Audio File