Michael G. Freedman (State Bar No. 281279)
THE FREEDMAN FIRM PC
1801 Century Park East, Suite 450
Los Angeles, California 90067
Telephone: (310) 285-2210
Facsimile: (310) 425-8845
Email: Michael@thefreedmanfirm.com

Attorney for Ippei Mizuhara

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 24-CR-00054-JWH |
| Plaintiff, | |
| v. | **IPPEI MIZUHARA'S MEMORANDUM REGARDING SENTENCING** |
| IPPEI MIZUHARA, | |
| Defendant. | Hearing Date: February 6, 2025<br>Hearing Time: 1:00 p.m.<br>Hearing Location: Courtroom 10A |

Ippei Mizuhara, by and through his counsel of record, Michael G. Freedman, hereby files his sentencing memorandum.  This memorandum is based on the attached memorandum of points and authorities and exhibits, all files and records in this case, and such argument and evidence as may be presented to the Court at the sentencing hearing in this matter.

Dated: January 23, 2025

Respectfully submitted,

*s/ Michael G. Freedman*
Michael G. Freedman

Attorney for Ippei Mizuhara

IPPEI MIZUHARA'S SENTENCING MEMORANDUM

# TABLE OF CONTENTS

I.    INTRODUCTION................................................................................1
II.   THE SENTENCING GUIDELINES ........................................................2
III.  THE 18 U.S.C. § 3553(a) FACTORS WARRANT A
      BELOW-GUIDELINES SENTENCE ......................................................3

    A.   The Nature and Circumstances of Mr. Mizuhara's Offense and Prompt
           Acceptance of Responsibility Warrant a Variance ...................................4

    B.   Mr. Mizuhara's History and Characteristics Justify a Variance ...............7

        1.   Mr. Mizuhara's Upbringing and Close Family .................................7

        2.   Mr. Mizuhara Built a Career as a Baseball Interpreter......................8

        3.   Mr. Mizuhara Was Devoted To His Work for Mr. Ohtani...............10

        4.   Mr. Mizuhara Suffers from a Severe Gambling Addiction.............13

            a.   Courts Routinely Vary Downward for Gambling ...................14

            b.   Mr. Mizuhara's Addiction Warrants a Variance .....................16

            c.   Dr. Whiting's Report Supports a Variance...............................18

    C.   A Variance Is Necessary to Ensure Just Punishment.............................19

        1.   Mr. Mizuhara's Reputation Has Been Destroyed............................20

        2.   Mr. Mizuhara Will Face Deportation After Incarceration ..............21

        3.   Mr. Mizuhara's Family Will Suffer As Well .................................22

    D.   A Guidelines Sentence Is Not Necessary to Deter Mr. Mizuhara ..........23

    E.   A Below-Guidelines Sentence Will Avoid Disparities ..........................25

IV.   CONCLUSION ..............................................................................25

IPPEI MIZUHARA'S SENTENCING MEMORANDUM

1

# TABLE OF AUTHORITIES

2

## CASES

*Gall v. United States*, 552 U.S. 38 (2007) ...................................................3

*Jordan v. De George*, 341 U.S. 223 (1951) ..............................................22

*Kimbrough v. United States*, 552 U.S. 85 (2007) ........................................4

*Nelson v. United States*, 555 U.S. 350 (2009) ............................................3

*United States v. Baker*, 502 F.3d 465 (6th Cir. 2007) ...............................24

*United States v. Booker*, 543 U.S. 220 (2005) ............................................3

*United States v. Brown*, 985 F.2d 478 (9th Cir. 1993) ................................5

*United States v. Caspersen*, 16-CR-414-JSR (S.D.N.Y. 2016) ...............14

*United States v. Checoura*, 176 F. Supp. 2d 310 (D.N.J. 2001) .............14

*United States v. Dikiara*, 50 F. Supp. 3d 1029 (E.D. Wis. 2014)...........15

*United States v. Gain*, 829 F. Supp. 669 (S.D.N.Y. 1993) ......................20

*United States v. Howe*, 543 F.3d 128 (3d Cir. 2008)..................................4

*United States v. Liu*, 267 F. Supp. 2d 371 (E.D.N.Y. 2003) ....................14

*United States v. MacKay*, 20 F. Supp. 3d 1287 (D. Utah 2014).............20

*United States v. Malley*, 307 F.3d 1032 (9th Cir. 2002) ............................5

*United States v. Mendez-Velarde*, 798 F. Supp. 2d 1249 (D.N.M. 2011) ..............22

*United States v. Milne*, 384 F. Supp. 2d 1309 (E.D. Wis. 2005).............5

*United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) ..............24

*United States v. Navarro-Diaz*, 420 F.3d 581 (6th Cir. 2005) ...............22

*United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007)............................19

*United States v. Sadolsky*, 234 F.3d 938 (6th Cir. 2000)..........................14

*United States v. Shanshan Du*, 570 F. App'x 490 (6th Cir. 2014) .........20

*United States v. Takai*, 941 F.2d 738 (9th Cir. 1991)................................4

*United States v. Vigil*, 476 F. Supp. 2d 1231 (D.N.M. 2007)..................21

*United States v. Villanueva*, 2007 WL 4410378 (E.D. Wisc. Dec. 14, 2007).........20

IPPEI MIZUHARA'S SENTENCING MEMORANDUM

*United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) ........................................4

**GUIDELINES AND STATUTES**

18 U.S.C. § 3553 ................................................................................................... *passim*

Pub. L. No. 98-473, § 239, 98 Stat. 1987 (1984) ..............................................23

U.S.S.G. § 5H1.4 ....................................................................................................14

**REPORTS**

Symposium, United States Sentencing Commission, Federal Sentencing Policy for
    Economic Crimes and New Technology Offenses, Plenary Session I, *"What
    Social Science can Contribute to Sentencing Policy for Economic Crimes"* (Oct.
    12, 2000) ........................................................................................................20

United States Sentencing Commission, *Measuring Recidivism: The Criminal
    History Computation of the Federal Sentencing Guidelines* (2016) ............ 23, 24

**OTHER**

APA Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1980) ..........15

APA Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) .........15

David Weisburd, et al., *Specific Deterrence in a Sample of Offenders Convicted of
    White Collar Crimes*, 33 Criminology 587 (1995) ............................................24

M. Potenza, et al., *Illegal Behaviors in Problem Gambling: Analysis of Data from
    a Gambling Helpline*, 28 J. Am. Acad. Psychiatry & L. 389 (2000) .................16

M. Toce-Gerstein, et al., *A Hierarchy of Gambling Disorder in the Community*, 98
    Addiction 9661 (2003) ......................................................................................16

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm:
    Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421
    (2007) ..............................................................................................................24

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Ippei Mizuhara faces sentencing for stealing from his boss, baseball star Shohei Ohtani, to fund his gambling addiction, which was exacerbated by the unique facts of this case.  As will be demonstrated in this sentencing memorandum and the accompanying letters and forensic psychologist's report, Mr. Mizuhara made a terrible mistake as a result of his serious gambling addiction, an anomaly in an otherwise law-abiding life in which he was dedicated to his career as an interpreter for Mr. Ohtani and other baseball players.

Mr. Mizuhara has publicly apologized and admitted his crimes by promptly pleading guilty.  He takes full responsibility for his conduct and accepts that he will face significant punishment.  In addition to the sentence this Court will impose, Mr. Mizuhara's addiction and his crime have already had and will continue to have profoundly devastating effects on Mr. Mizuhara and his family. Mr. Mizuhara swiftly lost his job and the career to which he had dedicated himself. His reputation has been irretrievably stained, both locally and in his native Japan, such that he can no longer obtain employment to support himself and his family. And because Mr. Mizuhara is not a United States citizen despite having grown up in the Los Angeles area, it is virtually certain he will be deported to Japan following his incarceration, where he and his family will continue to face great scrutiny and shame given the unique notoriety of this case in Japan.  Mr. Mizuhara's memorandum will focus on these factors relating to his own offense conduct, for which he takes full responsibility, and the appropriate punishment, which he is prepared to accept.  Based on all of these factors, Mr. Mizuhara agrees with the Probation Office's recommendation that the Court impose a downward variance from the Guidelines Range, and he respectfully submits that a below-Guidelines sentence of 18 months is sufficient, but not greater than necessary.

It is also important to note at the outset that, although his memorandum will

focus largely on Mr. Mizuhara himself and his own crime, he also wishes to make unequivocally clear that he fully recognizes and deeply regrets the profound effect his crime has had and will continue to have on Mr. Ohtani.  From the start of this case, Mr. Mizuhara has repeatedly and publicly apologized to Mr. Ohtani, the Dodgers, and Major League Baseball, and has been clear that he takes full responsibility for his crimes.  Mr. Mizuhara aptly summarizes these points and sincerely apologizes again in his letter to the Court when he writes:

> I understand that I have made a decision that will impact my entire life and I am not making excuses for what I have done.  I am not trying to justify my actions in any way.  I am asking that you will look at me as a man and believe change can happen.  I don't believe an apology will fix my wrong I am prepared accept my consequences.   I am asking for a little mercy from the court concerning my sentence you will hand down.  Thank you very much.

> Lastly, I truly admire Shohei as a baseball player and a human being and I was committed to devote my life so Shohei can be the best version of himself on the field.  I want to say I am truly sorry for violating his trust in me.

(Ippei Letter, Ex. 1, p. 3).

## II.    THE SENTENCING GUIDELINES

The Presentence Investigation Report ("PSR") was disclosed on September 18, 2024 and calculates Mr. Mizuhara's Guidelines range as 57 to 71 months.  (PSR, p. 3).  Specifically, the PSR calculated Mr. Mizuhara's base offense level for his bank fraud offense as 7 (U.S.S.G. §2B1.1(a)(1)), with a 20-level increase based on the loss amount (U.S.S.G. §2B1.1(b)(1)(K)), and a further two-level increase because the funds were obtained from a financial institution (U.S.S.G. § 2B1.1(b)(17)).  (PSR ¶¶ 43-48).  The PSR calculated Mr. Mizuhara's base offense level for his tax offense as 20 (U.S.S.G. §2T4.1(H)) and applied a two-level increase because the amount Mr. Mizuhara failed to report was over $10,000 in criminal proceeds (U.S.S.G. §2T1.1(b)(1)).  (PSR ¶¶ 54-62).  The PSR applied a

IPPEI MIZUHARA'S SENTENCING MEMORANDUM

further one-level increase for multiple counts (U.S.S.G. §3D1.4), for an adjusted offense level of 30.  (PSR ¶¶ 63-66).  The PSR applied a three-level decrease for acceptance of responsibility (U.S.S.G. §3E1.1) and a further two-level decrease because Mr. Mizuhara is a zero-point offender (U.S.S.G. §4C1.1), for a total offense level of 25.  (PSR ¶¶ 68-72).  The PSR determined that Mr. Mizuhara has zero criminal history points and so is in criminal history category I.  (PSR ¶¶ 74-80).  The Probation Officer recommends a variance from the Guidelines' advisory range and recommends a sentence of 48 months.  (Dkt. 50, pp. 1-2).

Mr. Mizuhara concurs with the PSR's calculations and joins in the recommendation for a below-Guidelines variance.  He respectfully submits that a sentence of 18 months is appropriate in in light of the factors enumerated under 18 U.S.C. § 3553(a), as discussed below.

## III.  THE 18 U.S.C. § 3553(a) FACTORS WARRANT A BELOW-GUIDELINES SENTENCE

While the sentencing guidelines are the starting point for the Court's consideration of sentencing, the guidelines do not adequately address all of Mr. Mizuhara's life circumstances, including his severe gambling addiction, or the punishment he has and will continue to suffer as a result of harm to his reputation and career in the global press and through certain deportation.

The core principles of sentencing have been resolved by the Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007). "The guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis omitted).  Factors justifying a sentence outside the guideline range are no longer required to be "extraordinary." *Gall,* 552 U.S. at 47.  "One theme" runs through the Supreme Court's recent sentencing decisions: "*Booker* empowered district courts, not appellate courts . . . [and] breathe[d] life into the authority of district court

IPPEI MIZUHARA'S SENTENCING MEMORANDUM

judges to engage in individualized sentencing. . .” *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008).  The primary directive in 18 U.S.C. § 3553(a) is for sentencing courts to “‘impose a sentence sufficient, but not greater than necessary,’ to accomplish goals of sentencing.” *Kimbrough*, 552 U.S. at 101.

The Court can – and should – take into account the testimonials provided and the details of Mr. Mizuhara’s history and characteristics in determining if any variance, and the length of such variance, should be applied.  *See, e.g.*, *United States v. Takai*, 941 F.2d 738, 744 (9th Cir. 1991) (“entirely appropriate” to consider outstanding good deeds as a relevant factor in determining whether criminal conduct was a single aberrant act); *United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) (variance based on “isolated mistake” in otherwise long and entirely upstanding life).

## A.    The Nature and Circumstances of Mr. Mizuhara’s Offense and Prompt Acceptance of Responsibility Warrant a Variance

Mr. Mizuhara’s offense conduct related to his work as the Japanese-English interpreter for Mr. Ohtani.  (PSR ¶ 15).  In addition to his interpreting duties, Mr. Mizuhara also worked as a “de facto manager and assistant to [Mr.] Ohtani” and would “handle daily tasks, and translate and manage certain business and personal matters outside of baseball activities.” (*Id.*)  In that role, Mr. Mizuhara helped Mr. Ohtani open a Bank of America account in 2018 and interpreted for Mr. Ohtani when the bank employee provided the login information for the account.  (PSR ¶ 16).  Several years later, in September 2021, Mr. Mizuhara began regularly placing sports bets with a bookmaker, quickly fell into tremendous debt, and illegally accessed Mr. Ohtani’s bank account using the login and password he knew from having helped to open the account.  (PSR ¶ 20).  Mr. Mizuhara illegally used Mr. Ohtani’s bank accounts and funds to pay his gambling debts, ultimately fraudulently obtaining at least $16,975,010 from Mr. Ohtani’s Bank of America account.  (PSR ¶¶ 21-28).  Mr. Mizuhara also failed to include on his 2022 tax

1   returns the $4,100,000 in additional income he had earned by stealing from Mr.

2   Ohtani.  (PSR ¶ 30-33).

3        As the Probation Office notes, "[t]he offense was easily discoverable,

4   Mizuhara was cooperative throughout the presentence investigation, he has been

5   complaint with his bond conditions, and he accepted responsibility for the

6   offense."  (Dkt. 50, p. 7).  It is undeniable that Mr. Mizuhara's acceptance of

7   responsibility was exemplary in this case, and all the more so given the uniquely

8   intense media scrutiny surrounding the case from the very start.  Mr. Mizuhara's

9   acceptance of responsibility and approach to the case is a considerable mitigating

10  factor and warrants a significant downward variance.  *See, e.g., United States v.*

11  *Brown*, 985 F.2d 478, 481 (9th Cir. 1993) ("The mere existence of section 3E1.1(a)

12  does not preclude the sentencing court from making an additional departure in the

13  case where the defendant manifests an extraordinary acceptance of

14  responsibility"); *United States v. Malley*, 307 F.3d 1032, 1034 (9th Cir. 2002).

15  Where the standard reduction for acceptance of responsibility does not fully

16  account for the true extent and nature of that acceptance, a court "may grant

17  additional consideration to defendants who demonstrate acceptance beyond that

18  necessary to obtain a two or three level reduction." *United States v. Milne*, 384 F.

19  Supp. 2d 1309, 1312 (E.D. Wis. 2005).

20       Specifically, Mr. Mizuhara's conduct burst into the spotlight in late March

21  2024 when Mr. Mizuhara was fired by the Los Angeles Dodgers, Mr. Ohtani's

22  baseball team, shortly before Opening Day.  Mr. Mizuhara was steadfast in his

23  acceptance of responsibility from the start, voluntarily allowing his phone to be

24  searched, and responding to the government, the Dodgers, and Mr. Ohtani's

25  counsel, all before the end of March.

26       True to his word, Mr. Mizuhara met with the government shortly thereafter,

27  on April 5, 2024, to acknowledge his acceptance of responsibility, confirm the

28

5

IPPEI MIZUHARA'S SENTENCING MEMORANDUM

government's evidence against him, and return property of Mr. Ohtani's to the government so it could be returned to Mr. Ohtani.

Mr. Mizuhara also recognized early on that any public steps in the case would draw media attention and possibly feed ongoing rumors at the time that somehow Mr. Ohtani was himself actually involved in gambling. Mr. Mizuhara well understood the devastating impact this would have on Mr. Ohtani, especially at the start of the season when he had just signed a historic contract with a new, high-profile team. Mr. Mizuhara's legal strategy was thus designed not only to confirm his own acceptance of responsibility but to do so in a manner that would minimize any further reputational harm to his victim, Mr. Ohtani. Accordingly, Mr. Mizuhara did not make any public statements until after the government had completed its investigation and filed its detailed complaint. The complaint confirmed to the world that Mr. Ohtani truly was a victim and had nothing to do with any gambling. It is worth noting that procedurally, it would have been more routine for Mr. Mizuhara to simply sign a pre-indictment plea agreement rather than waiting to be charged by a complaint, but he knew that the government's detailed complaint would be important to set the record straight and avoid feeding rumors that Mr. Mizuhara was simply pleading guilty to protect Mr. Ohtani, which he was not. In short, Mr. Mizuhara not only made clear from the start his acceptance of responsibility, but handled the case in such a way to confirm his guilt publicly and protect his victim's reputation from any further damage.

Mr. Mizuhara's commendable approach remained consistent throughout the case. Once he was arraigned on the complaint on April 12, 2024, he issued a brief statement through counsel, confirming his cooperation with the government, his intent to plead guilty, and directly apologizing to Mr. Ohtani, the Dodgers, and Major League baseball. He also confirmed in court and publicly his intent to seek treatment for his gambling, which he has done. Since that time, Mr. Mizuhara has not made any further comment despite intense media interest in the case and

repeated interview requests. After Mr. Mizuhara promptly pled guilty on June 4, 2024, the government noted in its press conference and elsewhere the promptness of the resolution and the Dodgers noted their pleasure that they and Mr. Ohtani could put the matter behind them and move forward in pursuit of a World Series title. Needless to say, the Dodgers succeeded in winning the World Series title after Mr. Ohtani's record-setting MVP season. Mr. Mizuhara has remained cognizant of the need to avoid further negative publicity for Mr. Ohtani and has ensured that, despite the need for several continuances of his own sentencing hearing, it will proceed before Mr. Ohtani and the Dodgers begin spring training in late February to avoid unwarranted further press attention during this important time for Mr. Ohtani and the Dodgers.

## B.    Mr. Mizuhara's History and Characteristics Justify a Variance

Mr. Mizuhara's history and characteristics are deeply intertwined with his offense conduct and warrant a significant variance. It is important for the Court to recognize Mr. Mizuhara's exemplary career as an interpreter, who was truly devoted to the baseball players for whom he worked, most notably Mr. Ohtani. Equally important and central to this case is Mr. Mizuhara's longstanding gambling addiction, which was uniquely exacerbated by his grueling work and exposure to high-stakes bookmakers in the world of professional athletes.

### 1.    Mr. Mizuhara's Upbringing and Close Family

Mr. Mizuhara was born in Japan in 1984 and lived there until he was in first grade, at which time he and his parents, Hidemasa and Chiharu, immigrated to the United States and settled in Diamond Bar, California. (PSR ¶ 82; Whiting Report, Ex. 9, p. 1). Mr. Mizuhara was an only child and he spoke no English when he arrived, so he had to repeat first grade. (PSR ¶ 82, Whiting Report, Ex. 9, p. 1). His mother relates that he had a very hard time with the English language, but eventually became fluent and would go out of his way to help her with her own difficulties with the language. (Chiharu Letter, Ex. 4, p. 1). But Mr. Mizuhara's

7

academic struggles ultimately continued into high school, and he was transferred from one high school to another his senior year, ultimately not graduating but earning a General Educational Development (GED) certificate. (PSR ¶ 85).

Mr. Mizuhara met his wife, Naomi, in Japan and they wed in 2018. (PSR ¶ 87). Naomi spoke no English, but would visit Mr. Mizuhara in California on limited visas during the American baseball season, when he was here working with Mr. Ohtani. (Whiting Report, Ex. 9, p. 4). Naomi began applying for a green card in 2018, but did not obtain it until 2023. She and Mr. Mizuhara were unable to see one another for significant stretches of time in 2021 due to pandemic travel restrictions and because Naomi was deported in 2022. (Whiting Report, Ex. 9, p. 4). Mr. Mizuhara notes that "[t]hat was a painful experience for both of us. She was detained in a small room for 24 hours and not treated well. I still feel horrible today about what she went through." (*Id.*). Mr. Mizuhara kept this personal challenge to himself and did not ask Mr. Ohtani or the Angels, his team at the time, for assistance. (*Id.*)

## 2. Mr. Mizuhara Built a Career as a Baseball Interpreter

In 2013, Mr. Mizuhara moved to Japan to work as an interpreter for a Japanese baseball team after learning of the opportunity through a friend. (PSR ¶ 86). Mr. Mizuhara provided interpreting services for five American players and their wives. He found that he had to be involved in every aspect of their lives, which he found "pretty overwhelming." (Whiting Report, Ex. 9, pp. 2-3). But, as a letter from his boss makes clear, he excelled at the job:

> There were more than 20 candidates for the position, but we made our decision right away because Ippei was totally sticking out on his presentation. Very calm, great language skills, and warm personality. He started working as our interpreter from January 2013. His work ethic was totally impressive. He always came to the clubhouse earlier than anyone else did and never complained about all the requests from players and coaches. He was the last one to leave the stadium most of the time and dedicated his time to all the international players every

8

IPPEI MIZUHARA'S SENTENCING MEMORANDUM

day.  He did whatever it took for the team. Duties for interpreters are not only interpreting. They take care of players on and off the field, including for their families. Fighters had 5 interpreters when Ippei was with us, but he was the most players' favorite interpreter for all of his years with Fighters because of his dedication. He never asked for a return whenever he did something special for players. Also, Ippei was very good at preparations, even before players asked to do something, Ippei well guessed what players would ask him to do so everything was ready for them right away.  . . . I strongly believe Ippei knows to pay for his mistakes, but these mistakes do not define who Ippei is. He is truly kind and great person and I hope you will consider his life as a whole.

(Iwamoto Letter, Ex. 5, p. 1).

His wife notes the same work ethic and dedication from the time she knew him, describing how "he tirelessly worked to support the American players by interpreting for them and helping with their day-to-day needs. He also extended his support to their families, and we often went out for meals with the players and their families privately. My husband truly cared for the players like family, ensuring they could focus entirely on baseball without any inconvenience. In return, they trusted and relied on him, and they built wonderful relationships."  (Naomi Letter, Ex. 2, p. 1).  And his mother writes that "[t]he American players all had high praises for Ippei and all of them said that they would have been lost without his dedication and support.  This made me proud as a parent and I'm sure Ippei knew first hand how difficult it was to start a new life in a new country so I felt like he was the perfect fit for the role." (Chiharu Letter, Ex. 4, p.1).

Similarly, an article published shortly after this case began vividly captures Mr. Mizuhara's hard work and the effect it had on the many players he helped. (Ex. 6).  The article describes how Mr. Mizuhara helped one of the players, Michael Crotta, "get a subway card and taught him the logistics of getting around the city. He took him to the grocery store more than once that first week, telling him what he liked to eat, what he liked to cook, how to navigate the aisles and

9

IPPEI MIZUHARA'S SENTENCING MEMORANDUM

shelves. They would go up and down the rows, and the interpreter would patiently explain how the store was laid out and how the Japanese words on the labels translated to English." (*Id.*). Another player on the team described Mr. Mizuhara as his "lifeline," explaining that "The translators are literally an extension of you. You don't have a means of communicating, no means of filling out paperwork. You can't live without them, and I looked at them as my friends, not team employees." (*Id.*) And Crotta stated that "I would have been completely lost without Ippei. Not just in baseball, but day-to-day life." (*Id.*)

It is clear that this generosity of spirit was not limited to baseball players. Mr. Mizuhara's father writes that "Ippei is a very kind person, especially to his family and friends. One of the first things he did with his first salary from his first real job back in the early 2000s was getting us a nice flat screen television. When our family friend Yasuo Matsuki had a thyroid surgery back in early 2000s, Ippei acted as his interpreter throughout the whole process and spent a few days at the hospital with him as Matsuki's English was not very good. They still thank him to this day for his efforts." (Hidemasa Letter, Ex. 3, p. 1).

### 3. Mr. Mizuhara Was Devoted To His Work for Mr. Ohtani

While still in Japan, Mr. Mizuhara began working as an interpreter for Mr. Ohtani, who was already a major star in Japan. The two formed a quick bond, as Mr. Mizuhara describes: "We played video games together. We joked. We got along. Before we moved in 2018, to the Angels, I was familiar with his family, and accustomed to how he wanted to portray himself to the public. He was very serious about training and practice, he was a hard worker at improving himself, and he was pretty private with what he revealed, personally, with the public. I respected him for that approach in both areas." (Whiting Report, Ex. 9, p. 3).

Mr. Ohtani's workload was immense, but Mr. Mizuhara explains that "I put my heart and soul into my work so Shohei can have the best career he can as a professional baseball player in the United States. I had sacrificed not only my own

life but my family's life to put Shohei as my number one priority ever since I started to work for him, and to this day I am very happy for all of the accolades and success he has had thus far." (Ippei Letter, Ex. 1, p. 1).

When Mr. Ohtani moved to the United States in 2018 to play with the Angels, Mr. Mizuhara went with him. Mr. Mizuhara also became an Angels employee, but was paid by Mr. Ohtani's management company in Japan during the offseason, because he continued working with Mr. Ohtani during the offseason, training and also fulfilling endorsement and appearance obligations as Mr. Ohtani's profile grew. (Whiting Report, Ex. 9, p. 3). When players move to the United States, they usually bring multiple staff members, such as a driver, trainer, chef, and other support. But Mr. Mizuhara was the only person Mr. Ohtani brought with him. As Mr. Mizuhara explains, "I drove him everywhere he had to be, went on frequent grocery runs, ran random errands whenever he needed it, so I felt like I was on call 24/7. On top of all of this, I had to communicate with his U.S. agent on a daily basis and also his mother (who was in charge of Shohei's management on the Japanese side) few times a week. With the busy baseball schedule and the international time difference, there were many times where I would be on the phone well past midnight and lose sleep." (Ippei Letter, Ex. 1, p. 1). Mr. Mizuhara also took on myriad other errands:

> I would also be running daily errands such as grocery shopping, checking his mail box, fixing his bicycle, accompany him when he went back to Iwate prefecture to visit his family, take his dog to the vet, take his dog to the groomer, drop off and pick up for his dinners he had with his peers while I wait in the car, helped coordinate Japanese and U.S. lawyers for his marriage prenup and attended the meetings, etc. On top of all this, I was responsible for communicating with all of his endorsement companies and brokerage companies to set up his production days for commercials which occurred once per week in between the training. I would accompany him to all of his production shoots which gave me almost no true days off. My only long consecutive days off would be around 4 days at the turn of the year which left me barely any time to spend with my wife. I often felt like

the off season was much much more busier and stressful compared to during the season.

(Ippei Letter, Ex. 1, p. 1).

Mr. Mizuhara's wife describes how:

when Shohei asked him to handle everything by himself upon moving to the U.S., my husband committed himself wholeheartedly to fulfilling that request. He worked tirelessly out of his love for baseball, his admiration for Shohei Ohtani, and his desire to see Shohei succeed. Even when he wasn't feeling well, he never took a day off and continued to support Shohei. I believe he constantly felt the pressure of having to handle everything on his own. The level of busyness and responsibility he endured is something unimaginable for a lot of people.

(Naomi Letter, Ex. 2, p. 1).

His parents note the same level of dedication to Mr. Ohtani. Hidemasa writes that "[b]y seeing it first hand, I am positive Ippei's dedication to Shohei was 100% genuine. He would often talk about how happy he is to see Shohei succeed in baseball. He not only sacrificed himself, but his time with his family to make sure Shohei is successful on and off the field." (Hidemasa Letter, Ex. 3, p. 1). And Chiharu echoes this sentiment, writing that "Ippei would often talk about how happy he is whenever Shohei played well. I can assure you that his dedication to Shohei was real. He always made Shohei his top priority and dedicated his life for him for the past 6-7 years." (Chiharu Letter, Ex. 4, p. 1).

As Naomi explains, Mr. Mizuhara's devotion to Mr. Ohtani was consistent with his fundamental character:

My husband prioritizes others over himself and helps people, even at his own expense. This has been true not only with his work but also with his family and everyone around him. He values his family greatly. At work, he introduced job opportunities to others and negotiated to ensure they received fair compensation. He cared for the younger team staff and encouraged players struggling with their performance by sending supportive messages. He stayed in touch with Japanese players and answered their questions about American training methods. He was always working to improve the lives of those around him. I've often

12

IPPEI MIZUHARA'S SENTENCING MEMORANDUM

seen him helping people who sought his support. When I asked him why he went so far to help others, he simply said, "If someone relies on me, I just want to do what I can to help." His actions reflect his respect and care for others.  My husband is someone who can love and support others without expecting anything in return. I believe many people have been helped by him, myself included.

(Naomi Letter, Ex. 2, p. 2).

Notwithstanding his considerable efforts and hard work, Mr. Mizuhara struggled financially.  To be readily available, Mr. Mizuhara lived next door to Mr. Ohtani in Newport Beach, California. Mr. Mizuhara earned around $85,000 yearly for the first three years but had to manage his rent and expenses on this salary. Additionally, his wife had to travel back and forth from Japan to California due to her immigration status.  These circumstances placed a considerable burden on him. (PSR ¶ 88).  And Mr. Mizuhara made far less during the offseason, even though he was often busier.  (Ippei Letter, Ex. 1, p. 1; Whiting Report, Ex. 9, p. 3).

But Mr. Mizuhara did not and does not fault Mr. Ohtani for these financial struggles.  On the one hand, he writes, "I felt like I was getting severely underpaid but I was afraid to speak up for myself as I was on a one year contract every year and I didn't want to upset them and end up getting fired," (Ippei Letter, p. 1), but on the other hand "I felt honored to be in the position I was in.  Even though I was stressed about money, I never considered saying anything to [Mr. Ohtani] about it."  (Whiting Report, Ex. 9, p. 3).

### 4.    Mr. Mizuhara Suffers from a Severe Gambling Addiction

As a result of this financial and mental stress and exposure to a high-profile world as Mr. Ohtani's star ascended, Mr. Mizuhara ultimately succumbed to the gambling addiction that he had long battled.  As Probation notes, in mitigation, it is important to note that Mr. Mizuhara has struggled with gambling dependence since the age of 18, with the severity of his addiction intensifying during this offense.  A significant startup credit of $20,000 from a bookmaker

IPPEI MIZUHARA'S SENTENCING MEMORANDUM

exacerbated his addiction, resulting in a peak loss of $17M within a short timeframe.  In just a little over two years from December 2021 through January 2024, Mizuhara placed approximately 19,000 wagers, averaging 25 bets daily. During this period, his total winning bets amounted to $142,256,769.74, while his total losing bets reached $182,935,206.68, leaving a net negative balance of $40,678,436.94.  It appears that his gambling addiction was a major driving factor behind his criminal behavior.  (Dkt. 50, p. 7).

> ### a.    Courts Routinely Vary Downward for Gambling

Although the Guidelines prohibit departure based on a compulsive gambling disorder, this restriction is advisory.  U.S.S.G. § 5H1.4.  And courts have granted downward variances on the basis of compulsive gambling disorder and have also held that it can be the basis for a diminished capacity departure under § 5K2.13. *See, e.g., United States v. Sadolsky*, 234 F.3d 938 (6th Cir. 2000) (affirming 2-level downward departure under § 5K2.13 based on defendant's compulsive gambling disorder); *United States v. Liu*, 267 F. Supp. 2d 371 (E.D.N.Y. 2003) (granting 4-level downward departure under § 5K2.13 where defendant pled guilty to using unauthorized credit card checks because defendant was pathological gambler who fit DSM IV criteria and was unable to control behavior he knew was wrongful); *United States v. Checoura*, 176 F. Supp. 2d 310 (D.N.J. 2001) (granting downward departure under § 5K2.13 where defendant in interstate transportation of stolen property case suffered from compulsive gambling disorder).

A particularly illustrative case is *United States v. Caspersen*, a securities fraud and wire fraud case with over $36 million in loss, in which the PSR calculated the Guidelines range as 151 to 188 months and the government sought a Guidelines range sentence, but the court instead imposed a far-below Guidelines sentence of 48 months due to defendant's gambling addiction.  16-CR-414-JSR (S.D.N.Y. filed June 14, 2016) (Dkt. 29 at 2, 32 at 2, 34).  The defense in *Caspersen* provided highly informative briefing and an expert opinion of Dr.

14

IPPEI MIZUHARA'S SENTENCING MEMORANDUM

Potenza on the nature of gambling addiction, which are attached here for the Court's reference at Exhibits 7 and 8, and summarized briefly below.

In support its arguments for a variance, the defense in *Caspersen* cited *United States v. Dikiara*, 50 F. Supp. 3d 1029 (E.D. Wis. 2014), where the defendant embezzled more than $1 million from her employer, most of which she gambled away. *Id.* at 1030; Ex. 7 at 7. The court acknowledged that, like in Mr. Mizuhara's case, "[w]hat began as stress relief soon grew into an addiction," and that the defendant "kept thinking she would eventually win enough to pay back the money she had taken." *Id.* at 1031-32; Ex. 7 at 7. Based on this gambling addiction, the court in *Dikiara* varied from the Guidelines range of 41 to 51 months, and imposed a sentence of 15 months. *Id.*

In 1980, the American Psychiatric Association ("APA") recognized pathological gambling as a mental disorder, classifying it as an "impulse control disorder." *See* Ex. 7 at 3, citing APA Diagnostic and Statistical Manual of Mental Disorders 324 (3d ed. 1980)("DSM-III"). In 2013, the APA reclassified it as an addiction-related disorder, reflecting the substantial body of research showing that pathological gambling and substance addiction affect similar areas of the brain in similar ways. *See Id.*, citing APA Diagnostic and Statistical Manual of Mental Disorders 585 (5th ed. 2013) ("DSM-V").

The DSM-5 defines gambling disorder as "persistent and recurrent problematic gambling behavior leading to clinically significant impairment or distress." Among its characteristics are: (i) preoccupation with gambling; (ii) chasing one's losses (gambling more money on more risky bets in an effort to recoup losses); (iii) lying to conceal the extent of gambling; (iv) jeopardizing one's job or career opportunity; and (v) relying on others to provide money to relieve desperate financial situations caused by gambling. Ex. 7 at 4, citing DSM-V. Studies find a high correlation between severe pathological gambling (8 to 10 DSM-IV symptoms) and illegal activity. *Id.* at 5, n. 3, citing *See* M. Toce-

15

IPPEI MIZUHARA'S SENTENCING MEMORANDUM

Gerstein, et al., *A Hierarchy of Gambling Disorder in the Community*, 98 Addiction 9661 (2003) (more than 60 percent correlation); *see also* M. Potenza, et al., *Illegal Behaviors in Problem Gambling: Analysis of Data from a Gambling Helpline*, 28 J. Am. Acad. Psychiatry & L. 389 (2000) ("these findings suggest that the gamblers with [illegal conduct] constitute a subgroup with more severe gambling-related pathology").

### b. Mr. Mizuhara's Addiction Warrants a Variance

Better than any studies, however, Mr. Mizuhara's own experience captures the powerful grip of this disease and its critical role in this case. Mr. Mizuhara began gambling when he was 18 years old, and frequented casinos about four to five times a week. (PSR ¶ 96). Virtually from the start, he incurred debts that his parents had to cover. (*Id.*) When he was 22, he began playing online poker and betting on sports. (*Id.*) After he began working with Mr. Ohtani for the Angels, his gambling activity increased significantly as he was exposed to several baseball players who held poker games in hotel rooms. (PSR ¶ 97). He also met Matthew Bowyer at this time, a bookmaker who ran a sportsbook. (*Id.*) Bowyer set up a gambling account for Mr. Mizuhara and extended him an initial $20,000 in credit, which Mr. Mizuhara assumed he was receiving because he worked for Mr. Ohtani and so Bowyer assumed the advances would be covered. (*Id.*) This was in 2021, when Mr. Mizuhara was also dealing with the challenges of his wife's immigration issues, and was struggling to keep up with his living expenses. (Whiting Report, Ex. 9, pp. 4-5). Mr. Mizuhara's sports betting quickly escalated and he bet on sports other than baseball multiple times a day, but frequently lost and ran up millions of dollars in losses. (PSR ¶ 98). He notes that, "[w]hat kept me going and getting worse, was the credit I had with the bookie because I would always pay off my debts." (Whiting Report, Ex. 9, pp. 6-7). In a cruel twist of fate, although none of this was Mr. Ohtani's fault, Mr. Mizuhara would never have been able to run up such debts with Mr. Bowyer had Mr. Bowyer not assumed the debts would

16

be covered by Mr. Ohtani.  Thus, Mr. Mizuhara's job, to which he was so devoted, caused him to be exposed to a unique world that directly and irreparably triggered his addiction.

Mr. Mizuhara describes how, when he met Mr. Bowyer, he did not even realize Mr. Bowyer's bookmaking business was illegal and how:

> [B]eing desperate for money at the time, I stupidly thought this might be an opportunity to help myself out financially and started to use his website for sports betting.  And before I knew it, the results were the complete opposite.  My gambling debt had grown so much that I could not find any way to pay it but to use Shohei's money… I felt terribly guilty about putting my hands on his money but this was the only solution I could think of at the time.  As the days went on, my debt kept growing and growing and at this point the only way I thought I can get out of this debt and pay him back was to win it back in gambling.

(Ippei Letter, Ex. 1, p. 1).

Mr. Mizuhara now recognizes that "I had a terrible addiction at the time and I only saw hope in life while I was gambling.  I learned my lesson in a very hard way and after seeing Dr. Whiting for my gambling problems." (Ippei Letter, Ex. 1, p. 1).  And as he described to Dr. Whiting:

> I became almost dead inside.  It was like I was just going through the motions.  Although I had always told myself that I would win it all back, as it became clear to me this was an impossibility, I think I just shut down.  But that did not stop me from placing more bets.  I felt really antsy and anxious if I did not have an active bet.  I felt pressure to stay in the game.  It was as if I was not doing what I needed to do, and wasting opportunity if I did have an active bet.  That sounds crazy now, but that's how I felt then.

(Whiting Report, Ex. 9, p. 5).

Mr. Mizuhara also now recognizes the harm he caused to Mr. Ohtani, explaining that:

> This sounds terrible, but I was always focused while I was gambling, and taking from that account, that I would win and make him whole.  Now that it's over, I deeply regret what I did to [Mr. Ohtani].  He makes

a lot of money, but that is not the point.  I ruined our relationship.  And
even though it was complicated at times, very one-sided, employee to
employer, I did feel we had as friendship and had many laughs together.
I believed in him.  I wanted him to succeed in America.  And while he
was making that happen, I was taking from him.  I feel bad about that.

(Whiting Report, Ex. 9, p. 5).

Fortunately, Mr. Mizuhara has now been receiving treatment since this
offense occurred.  He has been participating in online meetings of Gamblers
Anonymous three times each week and has found them helpful.  (Whiting Report,
Ex. 9, p. 6; PSR ¶ 100).  And he writes that "I can confidently say my gambling
days are behind me.  I would like to use my experience to help out other people
that are suffering from similar situations as me and give back to the community as
much as I can."  (Ippei Letter, Ex. 1, p. 1).

### c.     Dr. Whiting's Report Supports a Variance

Dr. Whiting's medical diagnosis confirms the severity of Mr. Mizuhara's
gambling addiction and the toll it has taken on his mental health.  Dr. Whiting
describes how Mr. Mizuhara "was stubbornly focused and dedicated to the mission
of winning back his losses, he was anxious if he did not play, and his gambling
involvement governed all of his time when he was not actively engaged with [Mr.
Ohtani] or the people around [Mr. Ohtani]."  (Whiting Report, Ex. 9, pp. 7-8).

And he describes Mr. Mizuhara as "defeated and angry with himself."

He is self-blaming for his failures, and feels that he has shamed himself.
He is experiencing low morale and a depressed mood.  He reports a
preoccupation with feeling guilty and unworthy.  He feels that he
deserves to be punished for the wrongs he has committed.  He feels
regretful and unhappy about life, and he is plagued by anxiety and
worry about the future.  He feels hopeless at times and feels that he is a
condemned person.  He has difficulty managing routine affairs, and the
items he endorsed suggest struggling with some memory functions,
concentration problems, and an inability to make decisions.  He appears
to be immobilized and withdrawn, and has little energy for life.  He
views his physical health as failing and reports numerous somatic

18

IPPEI MIZUHARA'S SENTENCING MEMORANDUM

concerns. He feels that life is no longer worthwhile and that he is losing control of his thought processes.

(Whiting Report, Ex. 9, p. 6).

In Dr. Whiting's view, Mr. Mizuhara's gambling addiction cannot be separated from his depression, which "had been long-standing and may have started in high school when he lost his first love relationship. For the next 10 years, he floundered in career choice and motivation. He has personality features of introversion, and possesses a negative world view, that are highly correlated with this clinical disorder." (Whiting Report, Ex. 9, p. 8). Mr. Mizuhara "does not present and identify his needs to others in his life. . . he never presented his troubling set of circumstances of feeling overworked, and stressed because of financial pressures to his employer/friend." (Whiting Report, Ex. 9, p. 8).

Dr. Whiting concludes that Mr. Mizuhara's gambling addiction may have been "a direct, unconscious attempt on Mr. Mizuhara's part to address his unidentified depression, beginning when he was yet in high school. He learned over time, that he could distract and redirect his problematic, dysphoric feeling states, with the intensity of gambling." (Whiting Report, Ex. 9, p. 9). But "despite the magnitude of his theft, [Mr. Mizuhara] does not have the characteristics of antisocial/sociopathic/offender individuals. In summation, this is a decent man, crippled by a gambling addiction, who, in a unique situation, was able to steal a large sum of money to cover an impulsive need to put funds at risk and lose them." (Whiting Report, Ex. 9, p. 9).

## C.    A Variance Is Necessary to Ensure Just Punishment

A Guidelines-range sentence is lengthier than necessary because Mr. Mizuhara has already faced and will continue to face severely punitive collateral consequences from this offense. District courts have imposed below-Guidelines sentences where the defendant faced significant collateral consequences from the conviction. *See, e.g.*, *United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007)

19

(affirming thirty-six-month downward variance warranted in child pornography case in part based on defendant's loss of teaching credentials and state pension as a result of the conviction); *United States v. Shanshan Du*, 570 F. App'x 490, 508-09 (6th Cir. 2014) (affirming sentence of 12 months where Guidelines were 78-97 months and holding that it was proper for district court to consider collateral consequence of defendant's deteriorating mental health throughout the multi-year fraud prosecution); *United States v. Villanueva*, 2007 WL 4410378 (E.D. Wisc. Dec. 14, 2007) (varying down twenty-four-months in drug case partly because defendant would be deported and separated from his family following conviction).

### 1.    Mr. Mizuhara's Reputation Has Been Destroyed

The Sentencing Commission has recognized that public nature of criminal charges and a well-publicized case cause many indignities for first-time offenders that it is tantamount to an already significant punishment.[1]  This is a factor the Court should consider in fashioning an appropriate sentence. *See United States v. MacKay*, 20 F. Supp. 3d 1287, 1297 (D. Utah 2014), *aff'd*, 610 F. App'x 797 (10th Cir. 2015) ("[R]ecognizing that the sentence imposed on MacKay must be just, the Court does not entirely disregard the considerable negative impacts this case has already had on him and his family.  He has already lost standing in his community, . . . lost his job, and otherwise experienced major financial setbacks, and has no doubt suffered many emotional pains and negative health consequences that accompany such a process"); *United States v. Gain*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by

---

[1] Symposium, U.S. Sent'g Comm'n, Federal Sentencing Policy for Economic Crimes and New Technology Offenses, Plenary Session I, *"What Social Science can Contribute to Sentencing Policy for Economic Crimes"* at 23 (Oct. 12, 2000) ("[T]he general deterrent effect of sanctions stems not so much from the length of the sentence but from fear of the social stigma and ostracism that attends to their imposition").

IPPEI MIZUHARA'S SENTENCING MEMORANDUM

the loss of his business); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation and widespread media coverage).

Mr. Mizuhara's offense, although his own responsibility, has nonetheless played out under intense media scrutiny given the connection to Mr. Ohtani, one of the most famous athletes in the world, and likely the most famous person in Japan. The press has so hounded Mr. Mizuhara that he could not leave his house for weeks, had to wade through a media scrum to attend each court appearance, was followed home from court by reporters, and remains bombarded by interview requests from around the world, especially from the Japanese media. After the Dodgers fired him, he tried to support himself by delivering for Uber Eats, but his photo was published and his employment was terminated. (PSR ¶¶ 104-105). As a result, he and his wife cannot work and have no income, and they rely on his parents, whose own ability to work has been limited by the press attention in this case. As. Mr. Mizuhara related to Dr. Whiting:

> This has not been pleasant at all. My mother had to stop working at her job as a nurse because she works with many Asians. My wife and I have been followed and harassed, and we have to be careful about going out in public. I realize this is all because of what I did, and I accept this, but it has not been easy. I must admit, I never thought about the shame that would come to my family if I failed to win back the money and got caught.

(Whiting Report, Ex. 9, p. 7).

Mr. Mizuhara is also likely to face considerable scrutiny while incarcerated, heightening the danger of time in custody. And he will continue to face great public attention as a result of this case, especially if he is deported to Japan.

### 2. Mr. Mizuhara Will Face Deportation After Incarceration

After any term of incarceration, Mr. Mizuhara will face ongoing punishment

IPPEI MIZUHARA'S SENTENCING MEMORANDUM

due to deportation.  Mr. Mizuhara is a permanent resident of the United States, but not a citizen.  By virtue of this felony conviction, he will likely face removal proceedings to Japan.  This is a severe consequence, which Mr. Mizuhara accepted in pleading guilty and taking responsibility for his offense.  Deportation also is a significant mitigation factor, and its effect is pronounced here given that Mr. Mizuhara will likely face even greater media scrutiny in Japan given Mr. Ohtani's extreme fame there.  *See United States v. Mendez-Velarde*, 798 F. Supp. 2d 1249, 1257 (D.N.M. 2011) (varying downward eighty months for myriad reasons, including defendant's deportation following his sentence); *Jordan v. De George*, 341 U.S. 223, 232 (1951) (Jackson, J., dissenting) (deportation is "a life sentence of banishment in addition to the punishment which a citizen would suffer from the identical acts.").

Furthermore, aliens face more severe restrictions in prison than non-aliens. *See United States v. Navarro-Diaz*, 420 F.3d 581 (6th Cir. 2005) (illegal reentry case remanded in light of *Booker* where district court noted that defendant would be punished more than a citizen due to ineligibility for halfway-house placement).

### 3.    Mr. Mizuhara's Family Will Suffer As Well

Mr. Mizuhara's crime and any sentence will have a deep effect on his closely knit family.  Mr. Mizuhara implores the Court to "please take into account what I am going to say as many lives are going to be touched and affected by your decision today."  (Ippei Letter, Ex. 1, p. 1).  He notes the problems he has already caused them, writing that as to his wife, "I feel terrible and really guilty for making her go through all of this.  She was never aware of my financial struggles as I hid it from her to keep more stress and anxiety off of her.  We would still like to have kids one day and I feel a lengthy imprisonment would be detrimental to those chances since we are both getting up there in age.  Her limitations on the English language would also make it hard for her to live without me, although my parents are very supportive of us and are willing to help her out if I'm not around."  (Ippei

22

Letter, Ex. 1, pp. 2-3).  His wife echoes these concerns, writing that "I have lost my parents and other family members. My husband is my only family. Since we met, we have faced difficult times and happy moments together. Losing him is the most painful thing I can imagine. His parents, who only have him as their child, also love him dearly. They are a wonderful, kind, and close-knit family filled with love. Our only wish is for our family to be together."  (Naomi Letter, Ex. 2, p. 2). His parents write that "[t]he thought of losing our son makes my heart ache everyday" (Chiharu Letter, Ex. 4, p. 1) and "[h]e is our only child and there have been so many times he helped us out.  He is a very important part of our family.  If possible, I wish to be able to continue to see him regularly.  I know that Ippei will have to pay for his mistakes but these mistakes do not define who Ippei really is. He is a truly kind person and I hope you could consider his life as a whole." (Hidemasa Letter, Ex. 3, p. 1).

### D.     A Guidelines Sentence Is Not Necessary to Deter Mr. Mizuhara

Section 3553(a)(2) requires courts to consider the need for a sentence to prevent a defendant from engaging in future criminal conduct or endangering society. *See* 18 U.S.C. § 3553(a)(2)(B)-(C). In this vein, Congress has advised that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society …." *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984). The Sentencing Commission has recognized offenders like Mr. Mizuhara – a 40-year-old man with no criminal history, as among the least likely to recidivate in the entire criminal justice system. [2] This is particularly true given the unique nature of Mr. Mizuhara's offense and its unique characteristics, which

---

[2] *See* United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 7, 12-13 (2016).

IPPEI MIZUHARA'S SENTENCING MEMORANDUM

1  will not occur again.[3]

2      A below Guidelines sentence is also appropriate because of Mr. Mizuhara's

3  compliance during his lengthy period of pretrial supervision. *United States v.*

4  *Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (in drug case where guidelines were

5  47-56 months, district court's sentence of one year and a day in prison and one

6  year home detention was reasonable in part because of defendant's "behavior while

7  on a year-and-a-half pretrial release, which the district court found to be

8  exemplary"); *United States v. Baker*, 502 F.3d 465 (6th Cir. 2007) (in gun case

9  where guidelines were 27-33 months, below-guideline sentence of probation with

10  one year house arrest proper in part because defendant behaved "exceedingly well"

11  while on pretrial supervision).

12      Dr. Whiting reports that "I have not identified anything in this assessment

13  that would suggest that Mr. Mizuhara poses a risk to commit a future offense.  The

14  magnitude of the offense conduct could never be repeated because of very rare

15  situation Mr. Mizuhara found himself in with [Mr. Ohtani].  With all of the

16  publicity associated with this case, Mr. Mizuhara will never again be trusted with

17  control/access to accounts owned by someone else.  I also believe that based on

18  this assessment, he seems to have fairly easily terminated this behavior when he

19  was arrested."  (Whiting Report, Ex. 9, p. 9).

20      And his wife writes:

21      My husband made a mistake, and I understand that it is something that
22      cannot be excused. However, he did not commit his wrongdoing for

---

24  [3] *See* Measuring Recidivism, supra, at Ex. 11 (first-time white collar offenders
25  least likely to recidivate); David Weisburd, et al., *Specific Deterrence in a Sample
   of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995)
26  (finding no difference in the deterrent effect of prison and probation for white-
   collar offenders); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice
27  Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict
   Resol. 421, 448-49 (2007).

IPPEI MIZUHARA'S SENTENCING MEMORANDUM

selfish or indulgent reasons. I believe he was not in a sound state of mind at the time. His work is more demanding than most can imagine, and even as he reached the limits of his physical and mental strength, he continued to protect and support our family. I deeply regret not being able to support him or notice his struggles during that time. The man my husband truly is would never deceive or hurt others. He is a kind and compassionate person. I am confident that he will never make the same mistake again. He is facing his actions and reflecting deeply on them.

(Naomi Letter, Ex. 2, p. 2)

### E.    A Below-Guidelines Sentence Will Avoid Disparities

A below-Guidelines sentence would also avoid unwarranted disparities under U.S.S.G § 3553(a)(6). According to the Sentencing Commission data, during the last five fiscal years (FY2019-2023), there were 168 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 25 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 164 defendants (98%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 39 month(s) and the median length of imprisonment imposed was 40 month(s). And there were 6 defendants whose primary guideline was §2T1.1, with a Final Offense Level of 25 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 5 defendants (83%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 30 month(s) and the median length of imprisonment imposed was 12 month(s). And, as discussed, Courts routinely vary downward significantly in cases involving a defendant's gambling addiction, which is the key mitigating factor in this case.

### IV.    CONCLUSION

For all the foregoing reasons, Mr. Mizuhara respectfully requests that the Court impose a sentence of 18 months.